Eddie B. **STOBNICKI,**
Plaintiff–Appellant,

v.

**TEXTRON, INC., et al., Defendants,**

**Rita Chiapciak, Individually and as Executrix of the Estate of Chester Stobnicki, Defendant–Appellee.**

No. 88–1047
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

April 5, 1989.
Rehearing Denied May 5, 1989.

---

John A. Spinuzzi, Denton, Tex., for plaintiff-appellant.

Thomas Herter, Edward Heller, Houston, Tex., for R. Chiapciak.

Before GEE, HIGGINBOTHAM, and DUHE, Circuit Judges.

GEE, Circuit Judge:

### Background

Eddie B. Stobnicki appeals a district court judgment holding that settlement is not possible in contested beneficiary cases to which ERISA applies because of the anti-alienation provisions of that statute, 29 U.S.C. § 1056(d)(1) and of the Internal Revenue Code, 26 U.S.C. § 401(a)(13). We reverse and reinstate the settlement agreement of the parties.

### Facts

This cause of action arose from competing claims to a pension whose lump sum assets of $63,193 were deposited with the court by the Bell Helicopter Textron Salaried Employees Retirement Plan (the Plan). An additional sum of $9,000 was also deposited with the court in full settlement of any further liability of the Plan to the remaining parties.

Benedict Stobnicki (Benny) was an employee of Bell Helicopter for thirty years. In 1951, he enrolled in the Bell Helicopter Pension Plan under a Group Insurance Contract with Banker's Life Insurance Co. At that time, he designated his brother Chester Stobnicki (Chester) as the beneficiary. In December 1951, Benny was also insured by Aetna Life Insurance Co. under a group policy. Chester was again the beneficiary. Benny died in September 1979, before his retirement. He was survived by the appellant, Eddie Stobnicki, and by his son Ben.

Benny and Eddie Stobnicki were originally married in 1956, but were divorced in 1962. The divorce decree did not divide the accrued benefits under Benny's retirement plan. In 1968, Benny and Eddie began to live together in common law marriage, an arrangement that continued until Benny's death in 1979. The trial court determined that the common law marriage was valid under Texas law, a finding not contested by the appellee.

The death benefits under the Bell Plan are provided for by more than one institution. Bankers' Life Company insured part of the death benefits, with Bell Helicopter as the policy holder of a group insurance contract. A trust fund held by the Rhode Island Hospital Trust National Bank of Providence, Rhode Island, provided the remainder of the death benefits. A committee selected by the Board of Directors of Bell Helicopter/Textron administered this trust fund.

In January 1967, during the period of his divorce from Eddie, Benny designated Chester the beneficiary of the policy issued by Bankers' Life. After Benny died, his wife Eddie learned that Chester was the beneficiary and caused Bankers' Life to file an interpleader action in state court in Des Moines, Iowa, to determine who was the proper beneficiary. In November 1981, with the action still pending, Chester died and his sister, Rita Ciapciak (Rita), became executrix of his estate and continued the Iowa litigation.

In 1982, Rita and Eddie entered into a settlement agreement. Pursuant to the settlement, Rita executed an instrument, styled an "assignment," which relinquished to Eddie all of Chester's rights to Benny's retirement, death or other employee benefits whatever. The administrator of the Plan, Bell Helicopter/Textron, refused to recognize the settlement, however, because the Internal Revenue Code, 26 U.S.C. § 401(a)(13) and ERISA, 29 U.S.C. § 1056(d)(1) deny tax benefits to plans that are assignable or alienable. Since Bell Helicopter refused to

pay, Eddie sued in state court. Bell Helicopter removed the action to federal court.

In November 1982, before Eddie served Rita with process, Rita died. Rita's niece and heir, who has the same name and is here referred to as "niece Rita," was therefore joined as a party to the action to determine the rights under the Plan. Eddie and niece Rita settled their claims, if any, against Bell Helicopter and the Plan, thus eliminating them as parties to the action. The sole issue for the trial court was to determine who was entitled to the funds deposited in the registry of the court.

In the trial court, Eddie claimed the death benefits under the Plan on three theories. She first claimed partial ownership of the funds under Texas community property laws. Next, she asserted full ownership of the funds as an equitable beneficiary. Finally, she asserted full ownership of the funds under the settlement agreement. Niece Rita argues that she was due the funds because Chester was the designated beneficiary and the assignment was void.

The trial court held that Eddie was not an equitable beneficiary and that the settlement agreement was void. The court found that ERISA did not, however, preempt Texas community property laws. Under Texas law, the court awarded Eddie her proportional interest in the retirement benefits based on the amount that was earned during their marriage, $23,101.76 plus accrued interest, and awarded Chester's estate the remainder. Since Chester was the validly designated beneficiary, the court award would pass by Chester's will.

## Analysis

### A. The Statutory Provisions

The trial court held that the settlement agreement was invalid under the Internal Revenue Code, 26 U.S.C. § 401(a)(13), which states that, "A trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that benefits provided under the plan may not be assigned or alienated." *Id.* ERISA, 29 U.S.C. § 1056(d)(1) echoes the Internal Revenue Code by providing

that, "Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated." *Id.* Facing such language, the trial court held that assignment was not possible, even to effect a settlement, and hence, in effect, that litigation was required to determine who was the proper beneficiary.

### B. Legislative History

#### 1. *General Purpose*

The legislative history of ERISA declares that the purpose of the Act was "the protection of individual pension rights." H.R. Rep. No. 93–533, 93d Cong., 2d Sess. (1974), *reprinted in* U.S.Code Cong. & Admin. News 4639 (1974). The Senate report emphasized the intent of the legislation:

Its most important purpose will be to assure American workers that they may look forward with anticipation to a retirement with financial security and dignity, and without fear that this period of life will be lacking in the necessities to sustain them as human beings within our society.

S.R. No. 93–127, 93d Cong., 2d Sess. (1974), *reprinted in* U.S.Code Cong. & Admin. News 4849 (1974).

#### 2. *The Anti-alienation Provision*

The congressional intent to prohibit alienation of benefits is broad and clear, but expressed in vague and general terms. On this score the House of Representatives report simply states:

To further ensure that the employee's accrued benefits are actually available for retirement purposes, the committee bill also contains a provision requiring the plan to provide that benefits may not be assigned or alienated.

### C. Interpretation of the Anti-alienation Statute

█ Although the general purpose of the anti-alienation provision is clear, Congress often fails to note that broad, sweeping prohibitions in the law rarely work justice, and often work to frustrate the purpose for which a law was originally enacted. We

will not ascribe to Congress the intent of making an unreasonable law—one requiring terminal litigation, rather than favoring settlements as does the general law. When a law so vaguely worded leads to an absurd result, courts look carefully to see if that result could have been anticipated. If so, we must carry it out; if not, we must try somehow to make sense of the enactment. While we agree with Francis Bacon that judges should interpret and not make law, we are also mindful that he imposed an obligation on judges to use and apply the law wisely. Bearing that in mind, we turn to examine the holdings of courts that have preceded us in considering exceptions to this apparent statutory bar against alienation.

### 1. *The District Courts*
#### a. The Middle District of Florida

Perhaps one of the most frequently cited and representative district court opinions is *Senco of Florida v. Clark*, 473 F.Supp. 902 (M.D.Fla.1979). In *Senco* the court considered whether the statutory bar in ERISA, 29 U.S.C. § 1056(d)(1), prohibited the state divorce decree from requiring that funds in a qualified pension plan be paid directly to the non-employee spouse. *Id.* at 907. The court thoughtfully examined the purpose of the Congress in enacting ERISA, which was "to protect the employees and their families from bargaining away the benefits provided by employee benefit plans qualified under ERISA." *Id.* at 908. The court reasoned that allowing execution of support orders would further, rather than hinder, the goals of ERISA in protecting families. *Id.* The court therefore recognized an exemption for support orders in the anti-alienation provision.

### 2. *The Circuit Courts*
#### a. The Second and Ninth Circuits

The Second Circuit has also considered the anti-alienation provision of ERISA. In *American Telephone and Telegraph Co. v. Merry*, 592 F.2d 118 (2d Cir.1979), the court found an implied exception to the anti-alienation provision of ERISA, 29 U.S.C. § 1056(d)(1), for court-ordered family support obligations. *Id.* at 121. The decision clearly turns on the fact that without an exception to the rule against alienation the very purpose of the statute would be frustrated. *Id.* at 124–25.

The Ninth Circuit has also held that the anti-alienation provisions of ERISA do not "preempt state court orders requiring a pension plan to pay a community property share ... to his or her ex-spouse". *Stone v. Stone*, 632 F.2d 740 (9th Cir.1980).

In another setting, the Second Circuit has held that pension benefits were includable in the property of the estate in a Chapter 13 proceeding, notwithstanding the anti-alienation provisions of New York law. *Regan v. Ross*, 691 F.2d 81, 83 (2d Cir.1982). The court also held that a bankruptcy income deduction order does not violate the I.R.C. § 401(a)(13) anti-alienation provision. *Id.* at 86. The court further explained that, "It seems equally clear that Congress could not have intended that § 401 qualification would turn on whether pension funds were used to fund Chapter 13 repayments." *Id.* at 87. While an I.R.S. private letter ruling did lend support to the facially-clear statutory bar against alienation, the court nonetheless found that I.R.C. § 401(a)(13) had been amended *sub silentio*. *Id.*

In *Ellis National Bank of Jacksonville v. Irving Trust Co.*, 786 F.2d 466 (2d Cir. 1986), the Second Circuit held that the anti-alienation provisions of ERISA, 29 U.S.C. § 1056(d) prohibited an employer from reclaiming funds contributed to an employee's pension plan even though the funds had been obtained by fraudulent practices. *Id.* at 467–68.

While the court noted that "Congress did not intend to preclude *all* assignments and alienations of pension plan funds," it stressed that the family of the faithless employee would not be well served by implying an exception to the rule against alienation. *Id.* at 470–71. If enforcing the clause had not furthered the goals of ERISA, the court might not have held as it did. *See, e.g., American Telephone & Telegraph Co. v. Merry*, 592 F.2d 118 (2d Cir.1979).

### b. The Sixth Circuit

In *United Metal Products v. National Bank of Detroit*, 811 F.2d 297 (6th Cir. 1987), the Sixth Circuit held there was no fraud exception to the anti-alienation provision of ERISA. *Id.* at 299. The court followed the reasoning of the Second Circuit in *Ellis National Bank, supra* at 466. The court refused to create an implied exception to the anti-alienation clause and stated that a balancing of equities should be undertaken by Congress rather than by the court. *Id.* at 300.

Although the Sixth Circuit reaches the same result on the fraud exception issue as the Second Circuit did in *Ellis National Bank*, the reasoning is not so persuasive. The Sixth Circuit did, however, note that an exception could be created when "a statute yields results so manifestly unreasonable that they could not fairly be attributed to congressional design...." *United Metal Products, supra* at 300.

### c. The Eleventh and District of Columbia Circuits

The Eleventh Circuit, unlike the Sixth Circuit, has held that the anti-alienation provision of ERISA does not block garnishment of an employee's pension funds when the employee has engaged in criminal conduct toward the employer. *St. Paul Fire and Marine Insurance Co. v. Cox*, 752 F.2d 550, 552 (11th Cir.1985). The Eleventh Circuit, noting various implied exceptions to the ERISA non-alienation clause that have been recognized by courts, concluded that one should be acknowledged to insure that an employee does not benefit from the results of his own misconduct. *Id.* at 551–52.

The District of Columbia Circuit has similarly held the anti-alienation provisions of ERISA will not prohibit a court from offsetting a party's interest in a plan because of a breach of fiduciary duty. *See Crawford v. La Boucherie Bernard Ltd.*, 815 F.2d 117, 121 (11th Cir.1987).

### D. Non-alienation and Settlement

Although our court has examined the non-alienation provision of ERISA in the context of bankruptcy, *see Matter of Goff*, 706 F.2d 574 (5th Cir.1983), we have not until today been afforded the opportunity of reviewing the scope of the provision. We have found no case in any circuit that has required determining whether a surviving spouse could settle a claim regarding pension benefits with another bona fide claimant. While Congress did make a bright-line rule, we are convinced that it never contemplated such a course of events as has transpired in this case and will surely transpire in others.

The harshness of the non-alienation rule is readily apparent. The decedent, Benny Stobnicki, died in 1979. As we review the record on appeal, it has been almost ten years since his death. Even assuming reasonable attorney fees, it will not take long to deplete a pension benefit of some $72,000, so that the litigant declared the beneficiary by the court wins little more than a Pyrrhic victory. The victor, forced to pay attorney fees from the retirement proceeds, will be left with little or nothing to live on. In many if not most instances the surviving spouse will be forced to live on social security alone until the slow wheels of justice have decided to whom the funds should be distributed.

■ As we note above, the legislative history reveals that Congress intended the Act "to assure American workers that they may look forward with anticipation to a retirement with financial security and dignity...." S.R. No. 93–127, 93d Cong., 2d Sess. (1974), *reprinted in* U.S.Code Cong. & Admin.News 4849 (1974). Little comfort indeed, however, is to be found in litigating away pension plan benefits to satisfy the blind edicts of an anti-alienation provision that creates unjust and unanticipated consequences, frustrating the purpose of the law. Like other courts which have faced it, we therefore conclude that the apparent statutory bar against alienation of pension benefits must once again yield to reason and to the purposes for which the Act was written. Just as our brethren of the Eleventh Circuit have determined that the bar must yield to the equitable maxim that a wrongdoer must not profit by his misdeeds,

so we conclude that it should not override the law's settled preference for settlement and composition of differences where that is possible, rather than litigation of them to the bitter end. We therefore hold that a controversy between good-faith adverse claimants to pension plan benefits is subject to settlement like any other, and that an assignment made pursuant to a bona fide settlement of such a controversy is not invalidated by the anti-alienation provision of ERISA, 29 U.S.C. § 1056(d)(1) or by that of the Internal Revenue Code, 26 U.S.C. § 401(a)(13). Since we hold that such a settlement is valid, we need not rule on the other theories of recovery advanced by the appellant. The settlement agreement between the parties is valid and enforceable, and the decision of the trial court is therefore

REVERSED.